593 A.2d 1299

**Cynthia K. HORST**

v.

**John P. HORST, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 23, 1991.

Filed July 3, 1991.

Andrew B. Brown, York, for appellant.

Gary L. Snyder, York, for appellee.

Before OLSZEWSKI, BECK and TAMILIA, JJ.

TAMILIA, Judge:

This is an appeal from the Order of the trial court which confirmed the temporary Order of a hearing officer fixing a support amount of $205 per week for two minor children,

ages four and seven. The primary issue posed to the trial court and presented here on appeal is whether appellant's contributions toward the college education of his son by a prior marriage constitutes a relevant factor which should have been considered by the hearing officer or court in determining appellant's child support obligation to the parties' two minor children.

According to the trial court Opinion, "[s]ubject to a preserved relevancy objection, the Defendant introduced testimony: 1) that John F. Horst, an eighteen year old, was able and willing to pursue his college courses in architectural engineering at Drexel University; 2) that Defendant personally contributed over $5,500.00 on behalf of son through either direct payments to Drexel, bi-weekly allowance checks of $100 and direct payments for sundry requirements; ...." (Slip Op., Uhler, J., 6/1/90, p. 16.) The parties dispute whether or not an agreement existed during the ten year marriage as to post-high school education for John.[1]

Appellant maintains that pursuant to the new Statewide Guidelines promulgated by the Supreme Court, Pa.R.C.P. 1910.16–1 to 1910.16–5 (effective 9/30/89), his payment of college training for his older child is a special circumstance entitling him to a downward adjustment of the amount he is obligated to pay under the support guidelines. We agree with the trial court that the college support provided by the father for the older child is not a relevant consideration in determining support for the minor children and the guidelines may not be adjusted to reflect those payments.

This issue is not novel to the court either before or since the advent of guidelines. Simply stated, the law in Pennsylvania since *Ulmer ex rel. Ulmer v. Sommerville*, 200 Pa.Super. 640, 190 A.2d 182 (1963), has been that a parent is not required to pay support for a child in college unless it is not an undue hardship. *See Brown v. Brown*, 327 Pa.Super. 51, 474 A.2d 1168 (1984). A corollary to this

---

1. Appellant lives with his present fiance who is not involved in any of the support considerations subject of this appeal.

principle is that which requires that a parent must sacrifice to support and maintain minor dependent children while he is not required to sacrifice to send his older children to college or post-high school training.[2] Applying these time-honored fundamental principles to the present fact situation, the issue of whether or not the father paid college support or how much could not be reached or resolved until it was first determined that the needs of the minor dependent children had been met and to what extent the father could reasonably provide for them.[3]

█ It is irrelevant whether the determination of child support is made by virtue of the guidelines, pursuant to the *Melzer* formula, *Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 991 (1984), or by agreement of the parties. Once the appropriate amount was ascertained for support of minor children based on the father's financial wherewithal, without considering voluntary payments for college, then if required to do so, the court could decide the amount available for college support. It is sufficient to state that the needs of the dependent children must be met, even if the father (parents) must sacrifice to do so. The guidelines are simply a means for expediting and making uniform the imposition of support Orders.[4] The underlying law has not been altered by their promulgation.

█ Applying the guidelines is an acceptable means for establishing the support Order for the minor dependent

2. The legislative intent in 23 Pa.C.S. § 4323, Support of emancipated child, makes it clear that parental responsibility ends at the time the child is emancipated which usually occurs at age 18.

3. In no event may college support be extended beyond primary training regardless of the parents' ability to pay. *Brown v. Brown,* 327 Pa.Super. 51, 474 A.2d 1168 (1984).

4. Guidelines are an important tool in expediting the flow of thousands of support matters but must take into consideration other factors such as the *Melzer* formula and the discretion of the trial judge in their application. *See Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 991 (1984); *Marshall v. Marshall,* 404 Pa.Super. 628, 591 A.2d 1060 (1991); *Szillery v. Wheaton,* 382 Pa.Super. 394, 555 A.2d 237 (1989); *Ryan v. DeLong,* 371 Pa.Super. 248, 538 A.2d 1 (1987); *Lampa v. Lampa,* 371 Pa.Super. 1, 537 A.2d 350 (1986).

children and consideration of the amount contributed by the father for college support for the older child was not an element in that consideration. College support is a separate and independent inquiry, which is not required here. The father's claim the court failed to consider his voluntary contribution toward the education of his son at Drexel University, in making an award for support to the minor dependent children, is without merit. His desire and willingness to continue that child's education is admirable and desirable, but it cannot diminish the father's primary duty to provide for the dependent children before reaching into the financial pool to educate the older child.

The trial court properly rejected appellant's claim that his contribution to the college education of one child was relevant to the support consideration of the minor children. As discussed above, the primacy of minor child support takes precedence over college support and the basic needs of the minor dependent child may not be reduced to allow for college support when funds are inadequate for both.

Order affirmed.

Concurring opinion by BECK, J.

BECK, Judge, concurring:

I write separately in order to elaborate on what I believe are the central and critical issues in the instant case, i.e., the proper application and interpretation of the state-wide uniform guidelines for child support awards in this Commonwealth and in particular, the principles which should govern what circumstances will justify a deviation from the guidelines. In my view, appellant raises an important issue of first impression which should be, but is not, directly addressed by the majority, i.e., whether and to what extent appellant's contribution towards the college education of his son from a prior marriage justifies a reduction in the child support obligation to his two minor children who are the subject of the instant order. Appellant argues that his assumption of a portion of his college-aged son's expenses

constitutes a "special circumstance" upon which to base a downward adjustment of the amount he is obligated to pay under the child support guidelines. Given that the appellant has directly raised the guidelines issue and that the guidelines have been newly promulgated, I do not agree with the majority that the case is "not novel" and that the promulgation of the guidelines is "irrelevant" to the resolution of the issues presented.

Moreover, I specifically dispute the majority's assertion in footnote 4 that child support cases which fall within the limits of the guidelines must continue to be decided in accordance with the *Melzer* formula of former case law. As the following discussion will explain, I conclude that where the guidelines are applicable, they and they alone determine the level of child support, absent special circumstances which might require equitable adjustment. Therefore, although I agree that the trial court correctly concluded that child support in the instant case should not deviate from guidelines levels, I cannot join in the majority's reasoning or language.

Appellant John P. Horst (husband) and appellee Cynthia Horst (wife) were married in 1977. At the time of their marriage, appellant had a son from a previous marriage, John F. Horst, who was then six years old. John F. lived with his father and his stepmother during their ten year marriage. Apparently husband never received child support from John F.'s mother due to her impoverished financial state. Husband and wife had two additional children, Jeremy, born in 1983, and Brianna, born in 1986.

The parties separated in 1988. The two minor children continued living with wife. John F. moved with his father when his father separated from his wife. After the separation, wife began a full time job although she had not worked during the latter half of the marriage.

In June, 1989, John F. graduated from high school with impressive academic success. In the fall of 1989, John F. entered the Drexel University five year architectural engineering program. His college expenses were met through a

combination of financial aid, loans, summer and school year earnings, and contributions from his father.

Wife petitioned for support for the parties' two minor children. A domestic relations hearing officer fixed appellant's child support obligation at $205.00 per week. This amount reflected the support guidelines amount plus an additional sum which was appellant's share of extraordinary child care expenses. Husband appealed to the trial court. At the hearing, husband's principal argument was that his payment of a portion of John F.'s college expenses entitled him to a reduction in child support payments owing to his two minor children.

At the hearing, wife, husband and John F. testified. Wife explained her child-related expenses, many of which were due to her full-time employment. She testified that although she and her former spouse assumed that John F. would attend college someday because he was an excellent student, no formal arrangement existed regarding how the expenses thereof would be met. Husband testified regarding the contributions he was making and anticipating towards John F.'s college expenses. He estimated that in the 1989–1990 school year, his contribution towards his son's education and living expenses was about $5,000–$6,000. Husband testified that he was currently living with a woman whom he expected to marry and that she contributed approximately $400 monthly to the living expenses of the household.[1] Husband also explained that John F.'s mother is unable to contribute to the support of her son through college.

Finally, John F. testified. He detailed his choice of college program, his academic achievements and his educational and career ambitions. He explained the five-year Drexel work-study program and his anticipated earnings for the forthcoming year. He confirmed that throughout his high school years he, his father and stepmother had infrequent and general conversations about his future college plans.

1. He further testified that his fiancee has two minor children and that she receives child support for one of them.

Having heard extensive testimony, and carefully considered the competing contentions, the trial court concluded that "[u]nder the facts presented, ... [husband's] voluntary support of his emancipated child is not a factor to be considered in fixing a child support award for the two minor children."

Appellant argues that the trial court's refusal to deviate from the presumptive child support guidelines as a result of his contributions to John F.'s college education constitutes a mechanical application of the guidelines and as such represents an abuse of discretion. On the contrary, I would find that the child support guidelines have structured and limited the scope of the discretion of the trial court in child support matters. I believe that the trial court acted consistently with both the letter and the spirit of the newly-promulgated guidelines. I reach this conclusion by examining the theoretical and historical roots of the child support guidelines, their goals and their proper application.

Pennsylvania, like most other states, enacted legislation providing for statewide guidelines. Pursuant to the legislation the Pennsylvania Supreme Court promulgated child support guidelines to ensure adequate, predictable and consistent levels of support for children who are the victims of family disruption. The guidelines are Pennsylvania's response to federal legislation.[2] The impetus behind the nationwide legislation is well-known but bears emphasizing here. Divorce has created a national economic crisis of overwhelming scope. The crisis is particularly acute for women and children because of the number of female-headed, single-parent families.[3] The number of such fami-

2. See footnotes 10 and 11.

3. In the vast majority of divorce cases, women receive custody of the children. Various studies conclude that roughly between 80–90% of custodial parents are women. See Goldfarb, *What Every Lawyer Should Know about Child Support Guidelines*, 13 F.L.R. 3031 (1987) *citing* Bureau of the Census, U.S. Dep't of Commerce, *Household and Family Characteristics: March 1985*, Current Population Reports, Series P–20, No. 411 at 11, Table G (1986); J. Wallerstein & J. Kelly, *Surviving the Breakup: How Children and Parents Cope with Divorce* 121 (1980); Weitzman & Dixon, *Child Custody Awards: Legal Stan-*

lies living in poverty exceeds the national average.[4]   More-
over, the rate at which women and children are descending
into poverty is of such proportions that studies have predict-
ed that, unless the present trend is slowed or reversed,
nearly all Americans living in poverty in the year 2000 will
be women and children in single-parent families.[5]   The
impoverishment of this segment of the population repre-
sents a problem of immense dimension for the entire nation.
It is estimated that one-half of the children in the United
States will spend at least a portion of their childhood living
in a single-parent home.[6]   While it is clear that not all of
these children will be living below the poverty line, many
will be.   The need for federal legislation was premised on
the theory that inadequate, unenforced and inequitable child
support awards have contributed to the crisis of poverty
which confronts single-parent families.[7]   Many custodial
parents have never been awarded child support.   Others
have been unable to collect the awards ordered.   Finally,
the awards, even if paid, often have been far too low to
approach even poverty-level subsistence standards, much

dards and *Empirical Patterns for Child Custody, Support and Visitation
After Divorce,* 12 U.C.D.L.Rev. 473, 502–503 (1979).   Thus it appears
that "single-parent family" is almost always synonymous with "female-
headed, single-parent family."

4.  See Billings, *From Guesswork to Guidelines—The Adoption of Uni-
form Child Support Guidelines in Utah,* 4 Utah L.Rev. 859, 867 (1989),
*citing* Bureau of the Census, U.S. Dep't of Commerce, *Money Income
and Poverty Status Of Families and Persons in the United States: 1985,*
Series P–60, No. 154, at 4, 6 (1986).

5.  National Advisory Council on Economic Opportunity, *Critical
Choices for the '80s* 1 (1980).

6.  *See* Goldfarb, *Child Support Guidelines: A Model for Fair Allocation
of Child Care, Medical, and Educational Expenses,* 21 Fam.L.Q. 325,
349 (Fall 1987), *citing* H.R.Rep. No. 527, 98th Cong., 1st Sess. 30
(1983).

7.  Of course, additional factors also add to the economic woes of
single-parent families, such as the discrepancy between the earning
power of women and men and the lost earning potential inherent in
the custody of minor children.   *See,* McLindon, *The Economic Disas-
ter of Divorce for Women,* 21 Fam.L.Q. 351, 396 (Fall 1987), *citing*
Fineman, *Implementing Equality: Ideology, Contradiction and Social
Change,* Wisc.L.Rev. 789, 830 (1983).

less the true cost of reasonable child-rearing.[8]

In addition to the inadequacy of child support awards, the inconsistency of such awards drew criticism. Often the existence or the amount of a child support order depended upon the individual and diverse attitudes of the judges before whom the cases were heard. These disparities engendered perceptions of unpredictability and unfair treatment among the parties. Finally, because courts and the parties had little guidance in setting and predicting the levels of awards, the efficiency of the court process was undermined and settlements were made more difficult.

As a partial response to these problems, Congress enacted the federal Child Support Enforcement Amendments of 1984[9] which required each state to adopt child support guidelines based on "specific descriptive and numeric criteria and [which would] result in a computation of the support obligation." Subsequently, the federal Family Support Act of 1988[10] strengthened the previous enactment and required that state guidelines create a rebuttable presumption regarding the amount of support a parent is obligated to pay.

Pennsylvania Rule of Civil Procedure 1910.16–1 *et seq.* represents this Commonwealth's compliance with federal

**8.** One commentator noted:

> According to recently released Census Bureau statistics, the average amount of court-ordered child support due in 1985 was only $2390 per year, or $199 per month. These meager awards covered an average of 1.7 million children. Average child support orders are inadequate to raise children even at the poverty level and amount to only a quarter of the average expenditures on children in a middle-class household.

Goldfarb, *What Every Lawyer Should Know About Child Support Guidelines, supra,* note 4, at 1301 (footnotes omitted); see also Williams, *Guidelines for Setting Levels of Child Support Orders,* 21 Fam.L.Q. 281, 283–284 (Fall 1987); Billings, *From Guesswork to Guidelines—The Adoption of Uniform Child Support Guidelines in Utah, supra,* note 4, at 863–869.

**9.** Child Support Enforcement Amendments of 1984, PL 98–378, 98 Stat. 1305 (codified at 42 U.S.C. § 667 (Supp.V.1987)).

**10.** Family Support Act of 1988, PL 100–485, 102 Stat. 2343, (codified at 42 U.S.C. § 651–669 (Supp.1989)).

law regarding child support guidelines. The rule creates a rebuttable presumption regarding what constitutes an appropriate level of child support based on the combined net incomes of both parties. As stated in Rule 1910.16–1(b), "[i]f it has been determined that there is an obligation to pay support, there shall be a rebuttable presumption that the amount of the award determined from the guidelines is the correct amount of child support to be awarded." In order to deviate more than 10% from the guidelines, the trial court must make specific findings which explain why a guidelines award would be "unjust or inappropriate." Pa. R.C.P. 1910.16–1(b). I believe that in order to properly understand what situations might legitimately warrant departures from the guidelines, it is necessary to appreciate the fundamental concepts upon which the guidelines are based and the basis on which the computations therein are made.

The child support guidelines adopted by this Commonwealth are based upon the Income Shares Model developed by the Child Support Guidelines Project of the National Center for State Courts.[11] The income shares approach to child support guidelines has as its fundamental precept that, following a divorce, children should receive the same proportion or "share" of parental income that would have been received had the household remained intact.[12] This concept is consistent with a recurring objective in family law which is to insulate children, wherever possible, from

11. *See* Pa.R.C.P. 1910.16–1, Explanatory Comment—1989, Introduction Part A. This approach has also been adopted by the Family Law Section of the American Bar Association. *See Report to the House of Delegates on Child Support,* 1986 A.B.A.Sec.Fam.L.Rep. 1. This method is not the only existing model for establishing support guidelines. In fact, a state-by-state study of the varying approaches to support computations reveals an enormous assortment of formulas and methods. *See Child Support Guidelines: A Compendium—March 1990,* National Center for State Courts.

12. *See* Pa.R.C.P. 1910.16–1, Explanatory Comment—1989, which notes that: "[The Income Shares] Model is predicated on the concept that the child should receive the same proportion of parental income that he or she would have received if the parents lived together."

the negative economic impact of divorce.[13]

The income shares approach upon which our guidelines are predicated operates as follows. The income of the two parents is determined and then combined.[14] This figure is then used to calculate a basic child support obligation. These calculations are based on extensive economic studies which purport to analyze and establish the estimated average expenditures for children in a two-parent family living in one household. The cost of supporting children reflected in the computations has been determined by studying families of varying size and at varying income levels. The basic child support obligation then is a figure which represents the proportion of the combined parental income which parents living together in the same household ordinarily spend on their children. The formula also permits adjustment to the basic child support obligation for extraordinary expenses or needs.[15] That amount is then divided between the parents in proportion to their respective net incomes. Where, as here, the children reside with one parent, that custodial parent's share of the child support obligation is retained and presumed to be spent directly on the children. The non-custodial parent's share is expressed in terms of a monthly child support award payable to the custodial parent.

At the heart of the economic principles underlying Pennsylvania's guidelines is an income-based model and not an expense-based model. *See Blaisure v. Blaisure*, 395 Pa.Super. 473, 577 A.2d 640, 642 n. 1 (1990) ("new guidelines assign a percentage of income, rather than a need determination, as the basis of the award"). The expense-based

13. *See Pharoah v. Lapes*, 391 Pa.Super. 585, 592, 571 A.2d 1070, 1074 n. 6 (1990); *Maurer v. Maurer*, 382 Pa.Super. 468, 473–75, 555 A.2d 1294, 1297 (1989).

14. Our guidelines are based on net income figures and provide for permissible deductions in order to arrive at monthly net income. Pa.R.C.P. 1910.16–5(b).

15. For example, in the instant case the parties divided the extraordinary child care expenses and child support payments were adjusted accordingly. *See* Pa.R.C.P. 1910.16–5(h).

model was viewed as inappropriate. First, as the comments to the guidelines observe, "[b]ecause household spending on behalf of children is intertwined with spending on behalf of adults for most expenditure categories, it is difficult to determine the proportion allocated to children in individual cases, even with exhaustive financial affidavits." Pa.R.C.P. 1910.16–1, Explanatory Comment–1989, Part A. A large portion of household expenditures fall into categories which do not lend themselves to reliable apportionment between adults and children. Moreover, in part because there are numerous hidden costs to child-rearing, parents regularly underestimate the amounts they spend on their children.[16] In addition, expense-based calculations of child-support unnecessarily engage judges and litigants in controversies involving subjective judgments about what constitutes a reasonable expense either for the parent or the child. Experience has shown that parties can easily control and even manipulate expenses and as a result child support determinations have often been inconsistent, arbitrary and inequitable.

The guidelines approach adopted by our Commonwealth eliminates the need to examine on a case-by-case basis the ordinary expenses of raising children. Because the guidelines grid and formula are based upon what an ordinary family spends to raise a child, ordinary expenses have already been taken into account. The quantitative computations already reflect a judgment regarding the reasonable expenses or needs of children in order to maintain minimal standards of well-being. Finally, the guidelines already include an approximation of the share of total family expenditures which should be attributed to children.[17] Principally because of these considerations, but also for reasons

**16.** *See* Billings, *supra* note 4, at 890 *citing* L. Weitzman, *The Divorce Revolution: The Unexpected Social and Economic Consequences for Women and Children in America,* at 272 (1985).

**17.** We emphasize again that the childrens' "share" which is allocated in the guidelines is the same share of the parents' economic resources that the children would have enjoyed if the family was intact. The childrens' share is *not* based on actual or theoretical amounts spent on the children in the custodial parent's new household.

of practicality, consistency and predictability, I believe that cases which fall within the income-level limits of the guidelines are to be decided by the guidelines grid or formula, and not by previous need-based case law formulas. I would conclude that the guidelines replace the *Melzer* formula which has as its basis the calculation of the "reasonable needs" of the child. *Melzer v. Witsberger,* 505 Pa. 462, 480 A.2d 991 (1984). In my view, only cases which fall beyond the scope of the guidelines are appropriate for the *Melzer* formula.

The guidelines seek to promote predictability, uniformity, and perhaps most importantly, adequate levels of support. Although courts are permitted, and even encouraged, to deviate from the guidelines when circumstances require departures to correct an inequity, deviations must be premised on appropriate considerations. Otherwise, the fundamental purpose of the guidelines is contravened.

The commentary accompanying the guidelines recognizes this principle and emphasizes it as follows:

> The guidelines make the support of a child a primary obligation. They assume that parties with similar net incomes will have similar reasonable and necessary expenses. After the basic needs of the parents have been met, the child's needs shall receive priority. A party will not be rewarded for making unnecessary expenditures for his or her own benefit by having his or her support obligation reduced. Neither will a party be penalized for living frugally by receiving less support. In most cases, the parties' living expenses are not relevant in determining that party's support obligations because a support obligation is not based upon the amount of money the parties are actually spending on themselves and their children. Rather, as the statute requires, the obligation is based upon the reasonable needs of a dependent spouse or child and the reasonable ability of the obligor to pay.

Pa.R.C.P. 1910–16.1, Explanatory Comment–1989, (B)(1).

Based on the foregoing discussion, it is clear that certain basic principles should govern our inquiry. The awards

calculated by the guidelines are presumptive. While the guidelines clearly do not compel rigid adherence, deviations are permitted in limited circumstances. Consistency and predictability are important twin goals of child support guidelines. These goals are defeated if deviations from the guidelines become more the rule than the exception. If the guidelines are to accomplish their desired purposes of equitable, adequate and predictable levels of support for children, the party seeking the deviation must convince the court that the guidelines amount would truly be "unjust or inappropriate". Pa.R.C.P. 1910.16–1(b). Therefore, deviations, although anticipated in appropriate circumstances, must be accompanied by specific findings and reasons justifying the deviation. *See* Pa.R.C.P. 1910.16–1(b); 1910.16–4(b). I conclude, therefore, that, given the presumptive nature of the guidelines, the party contesting the guidelines amount has the burden of justifying the deviation.

In order to assess whether a party has met his or her burden justifying a deviation, certain important principles must be kept in mind. Most importantly, the guidelines dictate that support obligations to minor children are fundamental and overriding. In fact the guidelines state that "a party is expected to meet this obligation by adjusting his or her other expenditures." Pa.R.C.P. 1910.16–5(a). Moreover, the guidelines presume that the awards calculated are necessary to meet the reasonable and basic needs of the children for whom support is owing. These computations represent amounts necessary to achieve minimal support.[18]

---

**18.** In fact, some commentators have argued that the income shares method upon which our guidelines are based underestimates the true cost of child-rearing in single-parent families and that therefore the awards based on this method should be viewed as a minimum in ordinary cases. This criticism is based on several factors including: 1) the income shares model is based on studies which focus on expenditures in two-parent households and that often a single parent incurs substantial additional child-related costs; 2) the economic studies upon which the model was based underestimated the actual costs of child-rearing even in a two-parent family; and 3) the income shares model does not take into account the non-monetary, and therefore difficult to quantify, costs of child-rearing such as time,

Therefore, downward deviations are the exception, not the rule.

The guidelines, however, are flexible and require that "special needs and obligations" must be considered in determining whether the court should deviate from the presumptive award. Rule 1910.16–5(a) provides an illustrative list of relevant factors in assessing the deviation. Thus, the rule provides that:

> The hearing officer, permanent hearing officer or the court must consider all relevant factors, including the following:
>
> (1) unusual needs and unusual fixed obligations;
>
> (2) other support obligations of the parties;
>
> (3) other income in the household;
>
> (4) ages of the children;
>
> (5) assets of the parties;
>
> (6) medical expenses not covered by insurance;
>
> (7) standard of living of the parties and their children; and
>
> (8) other relevant and appropriate factors.

In order to prevent inequities, the trial court retains the discretion to deviate from the presumptive awards when considerations such as those illustrated above, require deviation to achieve a just award.

It is in this context that I would reach the question of whether appellant met his burden in the instant case. Initially, husband argues that the trial court did not even consider his contributions to his college-aged son. Therefore, husband seeks remand and a direction to the trial court to take his support of John F. into consideration. I do not believe the record supports his contention that the trial court failed to consider the college contribution. First, the trial court heard extensive testimony on the college support issue. The trial court made numerous findings of fact in its opinion regarding the appellant's claim. The trial court

services and lost income potential. *See* Goldfarb, *supra* note 4, at 3036–3037.

discussed the college claim in its opinion and concluded that "under the facts presented," appellant's contributions to John F. should not be a factor in calculating his support obligation to the minor children. Therefore, it is clear to me that the trial court considered and rejected husband's claim.

The instant case illustrates the difficulty of balancing the competing equities in cases wherein the parent primarily obliged to pay child support is faced with other obligations, especially those arising from multiple families. However, the policy of our law is clear—minor children are the first priority. Wherever possible, minor children of a divorced family are not to be short-changed economically as a result of family dissolution. Absent extraordinary circumstances, appellant must provide support for them proportionate to his income and in line with the presumptive guidelines amount. Any other result would frustrate the goals of the guidelines and resurrect the problematic system of pre-guidelines child support determinations.

I recognize that John F. is clearly deserving of a college education. His scholastic aptitude and ambition are noteworthy. Moreover, I do not minimize the importance of obtaining a college education. Modern society increasingly calls for a more sophisticated, skilled and educated populace. I realize, too, that appellant and his elder son are both attempting to obtain as much outside financial aid as they believe is available. It is plain that appellant is in the difficult position of having too many dependants and too few resources to meet all their needs.

Despite the laudatory motive and nature of appellant's contribution to John F. and despite the son's academic excellence, the burden of his college education cannot fall on the minor children, who are without the wherewithal to provide for their own necessities or to postpone their growing up until their older brother finishes school. The duty to provide for minor children is basic. For college students, their expenses conceivably can be met by tapping other sources of aid or undertaking more onerous loans or by obtaining school year employment. These options are not

available to minor children and to their fully employed custodial parent.[19]   I note, too, that given the incomes of husband and wife which the trial court found as facts from the evidence at the hearing, the court-ordered support is already somewhat lower than the guidelines provide.[20]   I reiterate that the amounts set in the guidelines reflect the economic judgment of what constitutes minimal levels of support.

Therefore, I conclude that appellant did not meet his burden of showing that payments towards John F.'s college education required a reduction in the child support award presumed to be adequate under the guidelines.   I agree with the trial court that the minor children have a paramount claim to appellant's concededly limited resources and that his obligation to support them overrides his interest in assisting his elder son through school.   There was no abuse of discretion in the trial court's refusal to deviate from the support guidelines.   My conclusion is reached by relying on the guidelines and their underlying principles.   I strongly believe that the importance and meaning of the child support guidelines must clearly be construed for litigants, the bench and the bar, in order for the guidelines to achieve their intended and worthy purposes.

19.   There is no suggestion in the record that appellee has a greater earning potential than the income she is currently receiving, or that she is not working at full time capacity.

20.   Husband's income was found to be $2869.00 per month and wife's monthly income was set at $1,264.00.   Child care costs were determined to be $517.00 per month.   The guidelines would obligate husband to pay $672.00 monthly plus one-half of the child care costs which would approximate $930.00 per month.   The trial court ordered husband to pay $887.00 per month.